**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Neal J. Deckant (State Bar No. 322946)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
          ndeckant@bursor.com
          sbogdanovich@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK JAMES, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>  v.<br><br>SENTAI FILMWORKS, LLC,<br><br>      Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Patrick James ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

<u>**NATURE OF THE ACTION**</u>

1.     This is a class action suit brought against Sentai Filmworks, LLC ("Defendant" or "Sentai") for violating the Video Privacy Protect Act ("VPPA") by collecting and sharing highly sensitive and specific information about consumers' video consumption habits without their informed written consent.

2.     Sentai develops, owns, and operates hidive.com, a streaming video platform broadcasting over 500 different types of anime[1] videos ("HIDIVE").  HIDIVE's library contains wide variety of anime genres, ranging from Action and Adventure, to Family and Kids, to Comedy, and even the Supernatural.  It also contains some videos that many consumers would rather not want the world to know they watch, including various kinds of pornography.  Sentai tells consumers it can deliver these videos to them at "a price that won't make your wallet cry."[2]   But what might make consumers cry is Sentai's rampant disclosure of their private video consumption habits to numerous third-parties, without consumer's informed consent.

3.     As Congress has recognized, "films are the intellectual vitamins that fuel the growth of individual thought."  S. Rep. No. 100-599, at 7 (Oct. 21, 1988) (citing Senate Judiciary Subcommittee on Technology and the Law, Hearing Tr. at 10 (Aug. 3, 1988)).  Indeed, the videos people watch can often reveal their private politics, religious views, or sexuality—in other words, their most personal and intimate details.  *Id.*  In enacting the VPPA, Congress decided that this intimate information "should be protected from the disruptive intrusion of a roving eye." *Id.*

---

[1] Anime is a Japanese style of animation known for typically featuring characters with disproportionately large and emotive eyes.

[2] HIDIVE, https://www.hidive.com/about#:~:text=What%20is%20HIDIVE%3F,came%20into%20being%20in%202017. (last accessed 08/04/2023).

4.      The VPPA was meant to give consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

5.      HIDIVE violated the VPPA by knowingly disclosing personally identifiable information ("PII")—including a record of every documentary video consumed by Plaintiff and class members—to unrelated third parties without their informed written consent. HIDIVE installed computer code on its website, called the "Meta Tracking Pixel," which tracks and records Plaintiff and Class members' private video consumption. Behind the scenes of the webpages that display videos—and unbeknownst to video viewers—this code collects Plaintiff and class members' video-watching history and discloses it to Meta Platforms, Inc. ("Meta" or "Facebook"). Meta, in turn, uses Plaintiff and class members' video consumption habits to deliver targeted advertisements to them.

## PARTIES

6.      Plaintiff Patrick James is, and has been at all relevant times, a citizen of California who resides in Monterrey County, California.

7.      Defendant Sentai Filmworks, LLC is a Delaware limited liability company with its principal place of business at 10114 West Sam Houston Parkway Street, Houston, Texas. Defendant develops, owns, and operates hidive.com, which is used throughout California and the United States.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (*i.e.*, the VPPA). This Court also has supplemental jurisdiction over the California state claim because it arises from the same transactions and occurrences. This Court also has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2). The amount in controversy exceeds $5,000,000,

exclusive of interest and costs, and there are more than 100 members of the Class and the California Subclass, and there is minimal diversity.

9.      This Court has personal jurisdiction over Defendant because it conducts substantial business within California, including (1) the sale, marketing, and advertising of hidive.com to California consumers, (2) the collection of private information from Californian HIDIVE users, and (3) the disclosure of every HIDIVE user's private information to a California corporation, Meta Platforms, Inc.  Furthermore, a substantial portion of the events giving rise to Plaintiff's claims occurred in this state.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

### A.      The VPPA

11.     The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper, which was then published.  With an eye toward the digital future, Congress responded by passing the VPPA.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

12.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person,

engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

**B.      The Meta Tracking Pixel**

13.      Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[3]  Facebook describes itself as a "real identity platform,"[4] meaning users are allowed only one account and must share "the name they go by in everyday life."[5]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[6]

14.      Meta owns facebook.com and generates revenue by selling advertising space on Facebook, and other applications it owns, like Instagram.[7]

15.      Meta sells advertising space by highlighting its ability to target users.[8]  Meta can target users so effectively because it surveils user activity both on and *off its site*.[9]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[10]  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[11]

---

[3] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html

[4] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[5] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[6] FACEBOOK, SIGN UP, https://www.facebook.com/

[7] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[8] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[9] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[10] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[11] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

---

16.     Advertisers can also build "Custom Audiences."[12]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[13]  Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[14]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[15]  One such Business Tool is the Meta Tracking Pixel.

17.     The Meta Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[16]  When the Meta Tracking Pixel captures an action, it sends a record to Facebook.  Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

18.     Advertisers control what actions—or, as Meta calls it, "events"—the Meta Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[17]  Advertisers can also configure the Meta Tracking Pixel to track other events.  Meta offers a menu

---

[12] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[13] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE,
https://www.facebook.com/business/help/366151833804507?id=300360584271273.

[14] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[15] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK,
CREATE A WEBSITE CUSTOM AUDIENCE,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[16] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[17] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED,
https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST
PRACTICES FOR FACEBOOK PIXEL SETUP,
https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

---

of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[18]  An advertiser can also create their own tracking parameters by building a "custom event."[19]

19.     Advertisers control how the Meta Tracking Pixel identifies visitors.  The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[20] HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[21]  Pixel-specific Data includes "the Pixel ID and cookie."[22]

### C.     HIDIVE and the Meta Pixel

20.     HIDIVE operates the streaming video website hidive.com, which grants users who pay $4.99 a month access to its library of anime episodic series and movies.  The site is geared towards American consumers.  Non-English videos are either dubbed in English or include English subtitles, and every thumbnail in the library contains English text.



**Figure 1**

---

[18] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[19] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

[20] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

[21] *Id.*

[22] *Id.*

21.     Unknown to HIDIVE's consumers, however, HIDIVE also passes users' video consumption histories to Meta.  And so, for many HIDIVE consumers, what may have started out as movie night alone in the privacy of one's own home, with the Meta Tracking Pixel, has become a surprising public affair.

22.     The hidive.com website hosts the Meta Tracking Pixel.  On webpages with videos, hidive.com transmits four distinct events to Meta via the Meta Tracking Pixel: "ViewContent," "PageView," "Microdata," and "Button Click."  The first three events tell Meta which specific video the HIDIVE Consumer has requested or obtained, and the Fourth "Button Click" event tells Meta if and exactly when HIDIVE consumers press play or pause on the video.  In other words, Meta receives real-time data on what HIDIVE consumers are watching, as if Meta were lurking in the room with them.  *See* Figures 2-3.



**Figure 2**



**Figure 3**

23.    The "ViewContent" event discloses the title of the video in the "content_name" parameter, along with whether a viewer has an account, to Meta.[23]  Figure 4.  PageView discloses a webpage's Universal Resource Locator ("URL"), which also contains the title of the video, to Meta.  *Id.*  And Microdata discloses various kinds of information about the video, including its title, description, and keywords, to Meta.  Figure 5.



**Figure 4**



**Figure 5**

24.    All three events, "ViewContent," "PageView,"and "Microdata," independently, permit an ordinary person to identify a video's content, title, and location.

25.    Moreover, a new "ButtonClick" event is activated and informs Meta every single time a HIDIVE consumer clicks on the "Play," "Pause," "Quick-rewind," or "Quick-forward" button on the video via the "buttontext" parameter.  Figures 6-9.



**Figure 6**



**Figure 7**

---

[23] This data derives from a tool created and offered by Facebook.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Figure 8**                                                        **Figure 9**

26.     This "ButtonClick" event is transmitted to Meta in just fractions of a second, and gives Meta a real-time look into exactly what a particular HIDIVE consumer is watching as he or she is watching it.  Figure 10 shows a "ButtonClick" event for the same video reflected in Figure 2 showing that the "Pause" button was clicked, as transmitted to the facebook.com domain, owned by Meta.  Figure 11 shows that the video was paused after the undersigned spent 14.45 seconds on the webpage, that HIDIVE sent a transmission of the event to facebook.com in just 0.61 milliseconds, that 40.33 millisecond passed as the transmission went from the consumer's server to the facebook.com server and back, and that the event was downloaded by facebook.com in just 0.75 milliseconds.  Both Figures 10 and 11 were accessed through the site's developer tools (accessed via a computer keyboard's F12 button).



**Figure 10**



**Figure 11**

27.     When a visitor watches a video on HIDIVE while logged into Facebook, HIDIVE compels a visitor's browser to transmit an identifying "computer cookie" to Meta called "c_user," for every single event sent through the Meta Tracking Pixel.  The c_user cookie contains that visitor's unencrypted Facebook ID.  When accessing one of the above videos, for example, HIDIVE compelled the browser to send cookies to Meta.

28.     Figures 12 through 14, displayed on the next page, show the c_user cookie being transmitted from HIDIVE to facebook.com, as shown by the site's developer tools, via the Meta

Tracking Pixel's ViewContent event, indicating that the consumer has watched *Twittering Birds Never Fly – The Clouds Gather*, a sexually explicit anime film.[24]



**Figure 12**



**Figure 13**

---

[24] This film is used for illustrative purposes only, and these allegations are not meant to imply that this film is part of Plaintiff's viewing history, which is private. HIDIVE hosts a variety of content, from cartoons for minors to sexually explicit material for adults. That said, the purpose of the VPPA is to prevent the wrongful disclosure of *any* viewing habits, regardless of the subject matter of the material. These privacy concerns are even more germane to HIDIVE, given the wide variety of content it hosts.

| | Headers | Payload | Preview | Response | Initiator | Timing | Cookies |

**Request Cookies**    ☐ show filtered out request cookies

| Name | Value | Domain |
|------|-------|--------|
| datr | IKMTZDnp92T5Bkqwh2LEBedt | .facebook.com |
| sb | FXEXZF66qmf7QYrBRI0wetan | .facebook.com |
| c_user | 1528550551 | .facebook.com |
| m_ls | %7B%22c%22%3A%7B%221%22... | .www.facebook.com |
| xs | 24%3ATWFeKjQ4G0FB5A%3A2%... | .facebook.com |
| fr | 0y87Bkg15YF5EvtU8.AWUhUhsv_... | .facebook.com |

**Figure 14**

29.     The c_user cookie is personally identifiable information because it contains a consumer's unencrypted Facebook ID.  A Facebook ID allows *anybody*—not just Facebook—to identify the individual HIDIVE consumer with a Facebook account.  If one types www.facebook.com/[FacebookID] a into web browser, it will load that individual's Facebook page.  For example, the c_user cookie in Figures 7-9 is 1528550551, and www.facebook.com/1528550551 leads to the undersigned's Facebook page.

30.     The Meta Tracking Pixel transmits additional cookies to Meta.

31.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[25] Facebook, at a minimum, uses the fr cookie to identify particular users.[26]

32.     Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  Facebook uses this for targeted advertising.

33.     The Meta Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, hidive.com.[27]  A third-party cookie is

---

[25] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf.

[26] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[27] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

"created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[28]

34.    Meta, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

35.    A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of https://facebook.com.

36.    Through the Meta Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Meta to know, among other things, what hidive.com videos a user has requested and obtained, and when they pressed play, pause, fast-forward, or rewind.[29]

37.    HIDIVE even records and discloses the content of communications consumers have with it.  Whenever HIDIVE consumers type any text into the website's search bar, that searched text is recorded, intercepted, and disclosed to Meta as well, through yet another Meta Tracking pixel event, "Search."  So, for example, if a HIDIVE consumer asks to see "funny anime with animals," Meta intercepted this communication and knows the consumers asked to see "funny anime with animals."



**Figure 15**

---

[28] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

[29] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.



**Figure 16**

38.     All this video consumption information is highly personal to HIDIVE consumers. Indeed, many consumers may have various interests they do not want to be made public due to potential social stigma.[30]  Others may be gay and have not come out to their family members for fear of alienation.  And others may be dealing with substance abuse issues, eating disorders, or other mental health issues they would also prefer to keep private.  These most intimate and personal details about individuals can often be gleaned from the videos they view or the searches they perform on HIDIVE, and yet Sentai freely discloses this information with Meta.

39.     Sentai discloses these identifiers so Meta can match them with a corresponding Facebook profile and link it to a subscriber's subsequent activity on hidive.com.

40.     By compelling a visitor's browser to disclose the c_user and fr cookies alongside event data for videos, Sentai knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

41.     Meta confirms that it matches activity on hidive.com with a user's profile.  Meta allows users to download their "off-site activity," which is a "summary of activity that businesses

---

[30] This allegation is not meant to imply that Plaintiff has interests that carry a social stigma. Rather, the point is that HIDIVE hosts a wide variety of content; some content is innocent cartoons for children, and others are sexualized content for adults.  Regardless of the precise content consumed, the VPPA is designed to protect against the wrongful disclosure of viewing history, for anyone.

1   and organizations share with us about your interactions, such as visiting their apps or websites."[31]

2   The off-site activity report confirms Sentai identifies an individual's video viewing activities.

3          42.      Moreover, Defendant Sentai never obtained consumers' informed written consent to

4   share this deeply private information with Facebook.  Instead, on or before December 24, 2022,

5   Sentai would not let consumers view any view any videos or otherwise navigate hidive.com unless

6   they clicked "Accept" on a pop-up button that never clearly and conspicuously informed HIDIVE

7   consumers what personally identifiable information they collected and disclosed to Meta.  *See e.g.*,

8   Figures 17 and 18. [32]  On or before December 24, 2022, Sentai never gave HIDIVE consumers the

9   ability to opt-out of this disclosure to Meta.



**Figure 17**

---

[31] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?,
https://www.facebook.com/help/2207256696182627.  As discussed there, the Off-Facebook
Activity is only a "summary" and Facebook acknowledges "receiv[ing] more details and activity
than what appears in your Facebook activity."  What is more, it omits "information we've received
when you're not logged into Facebook, or when we can't confirm that you've previously used
Facebook on that device."

[32] Figure 17 is a hidive.com webpage including a video that was preserved by the Internet Archive,
as it appeared on December 7, 2022.  Other screenshots of hidive.com webpages not including
videos, also preserved by the Internet Archive, showed this same pop-up continued to appear on
hidive.com until December 24, 2022.

**ⓘ COOKIES & PRIVACY**

We use cookies to ensure you get the best experience possible when visiting HIDIVE. Continue browsing if you are happy with our Privacy Policy

ACCEPT

**Figure 18**

43.     The VPPA only permits video tape service providers like Sentai to disclose a consumers' personally identifiable information if they obtain consumer "informed, written consent," beforehand, which gives consumers "an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election."  18 U.S.C. §2710(b)(2)(B).  Because this pop-up does not disclose what information is being shared, it does not solicit consumers' **informed** consent, and even if it did, it never gave consumers the opportunity, in a clear and conspicuous manner, to withdraw from these disclosures.

**D.     Experience of Plaintiff**

44.     In or around 2009, Plaintiff James created a Facebook account.

45.     In or around December 2021, Plaintiff James created a hidive.com account and began paying for a subscription to watch videos on the website.

46.     Since creating an account, Plaintiff James frequently watched various anime videos on hidive.com.

47.     When Plaintiff James watched videos on hidive.com, Defendant disclosed his event data, which recorded and disclosed the video's title, URL, and video description to Meta. Alongside this event data, Defendant also disclosed identifiers for Plaintiff James including the c_user and fr cookies to Meta.

48.     By disclosing his event data and identifiers, Defendant disclosed Plaintiff James's personally identifiable information to a third-party, Meta.

49.     Plaintiff James discovered that Defendant surreptitiously collected and transmitted his personally identifiable information in July 2023.

## CLASS ALLEGATIONS

50.     **Class Definition**: Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who have Facebook and hidive.com accounts, and viewed videos on hidive.com (the "Class") on or before December 24, 2022.

51.     **First California Subclass Definition**: Plaintiff also seeks to represent a class of similarly situated individuals defined as all Class members in the State of California (the "First California Subclass").

52.     **Second California Subclass Definition**: Plaintiff also seeks to represent a class of similarly situated individuals defined as all Class members in the State of California who typed in any text content into the hidive.com search bar (the "Second California Subclass").

53.     Subject to additional information obtained through further investigation and discovery, the above-described Class and Subclasses may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

54.     **Numerosity (Fed. R. Civ. P. 23(a)(1))**:  At this time, Plaintiff does not know the exact number of members of the aforementioned Class and Subclasses.  However, given the popularity of Defendant's website, the number of persons within the Class and Subclasses is believed to be so numerous that joinder of all members is impractical.

55.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3))**:  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class and Subclasses that predominate over questions that may affect individual members of the Class and California Subclass include:

(a)     whether Defendant collected Plaintiff's and the Class's PII;

(b)     whether Defendant unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;

(c)     whether Defendant's disclosures were committed knowingly;

(d)     whether Defendant disclosed Plaintiff's and the Class's PII without consent;

(e)     whether Defendant's conduct violates California Civil Code § 1799.3;

1

2

3

    (f)      whether Defendant intentionally recorded Plaintiff and the California Subclass members' communications under the California Invasion of Privacy Act ("CIPA"); and

4

5

    (g)      whether Plaintiff and California Subclass members' search terms are the content under the California Invasion of Privacy Act.

6

7

8

9

    56.     **Typicality (Fed. R. Civ. P. 23(a)(3))**:  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class and Subclasses, used hidive.com to watch videos, and had his PII collected and disclosed by Defendant, and had his communications recorded by Defendant, without his consent.

10

11

12

13

14

15

16

17

18

19

20

    57.     **Adequacy (Fed. R. Civ. P. 23(a)(4))**: Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and CIPA.  Plaintiff and his counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class.  Neither Plaintiff nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class. Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Class and Subclasses, and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class and Subclasses, additional claims as may be appropriate, or to amend the definition of the Class and Subclasses to address any steps that Defendant took.

21

22

23

24

25

26

27

28

    58.     **Superiority (Fed. R. Civ. P. 23(b)(3))**:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class and Subclasses is impracticable.  Even if every member of the Class and Subclasses could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of

this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class and Subclasses.  Plaintiff anticipates no difficulty in the management of this action as a class action.

### CAUSES OF ACTION
### COUNT I
### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710, *et seq.*

59.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

60.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

61.     Defendant is a "video tape service provider" because it creates, hosts, and delivers thousands of videos on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).  In particular, Defendant provides a library of audiovisual material for a monthly fee.  Defendant also uses the videos to collect and disclose viewers' PII so it can later retarget them for advertisements.

62.     Plaintiff and members of the Class are "consumers" because they have accounts with hidive.com and pay to watch videos.  18 U.S.C. § 2710(a)(1).

63.     Defendant disclosed to a third party, Meta, Plaintiff and the Class members' personally identifiable information.  Defendant utilized the Meta Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like their Facebook ID, along with Plaintiff's event data, like the title of the videos they viewed.

64.     Plaintiff and the Class members viewed videos using hidive.com.

65.     Defendant knowingly disclosed Plaintiff's PII because it used that data to build audiences on Meta and retarget them for its advertising campaigns.

66.     Plaintiff and Class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

67.     Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  In particular, Defendant's disclosures to Meta were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

68.     On behalf of himself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## COUNT II
### Violation of California Civil Code § 1799.3

69.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

70.     Plaintiff brings this claim individually and on behalf of the members of the proposed First California Subclass against Defendant.

71.     Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sales … services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

72.     Defendant is a "person providing video recording sales … services" because it sells access to its online video stream platform, hidive.com, which creates, hosts, and delivers thousands of videos on its website.

73.     Defendant disclosed to a third party, Meta, Plaintiff and First California Subclass members' personal information.  Defendant utilized the Meta Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like their Facebook ID, along with Plaintiff's event data, like the title of the videos they viewed.

74.     Plaintiff and the First California Subclass members viewed videos using hidive.com.

75.     Defendant willfully disclosed Plaintiff's PII because it used that data to build audiences on Facebook and retarget them for its advertising campaigns.

76.     Plaintiff and First California Subclass members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

77.     On behalf of himself and the First California Subclass, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the First California Subclass by requiring Defendant to comply with Cal. Civ. Code § 1799.3's requirements for protecting a consumer's PII; (iii) statutory damages of $500 for each violation of this law pursuant to Cal. Civ. Code § 1799.3(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

### COUNT III
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631**

78.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

79.     Plaintiff brings this claim individually and on behalf of the members of the proposed Second California Subclass against Defendant.

80.     To establish liability under section 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

**Aids, agrees with, employs, or conspires with any person** or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

81.     Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email.  *See In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA claim based on Meta's collection of consumers' Internet browsing history outside the https://facebook.com domain).

82.     Sentai has installed the Meta Tracking Pixel on its website, hidive.com.

83.     The Meta Tracking Pixel is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

84.     At all relevant times, by using the Meta Tracking Pixel, Meta intentionally tapped, electrically or otherwise, the lines of internet communication between Plaintiff and Second California Subclass members.

85.     In particular, the Meta Tracking Pixel recorded communications between HIDIVE, on one hand, and Plaintiff and Second California Subclass members, on the other hand, by collecting the search terms that Plaintiff and Second California Subclass members entered.  These were communications where HIDIVE asked Plaintiff and California Subclass members what they wanted to search and Plaintiff and Second California Subclass members' responses were recorded in text that was entered into the hidive.com search bar, which, in turn, were disclosed to Meta.  *See* Figures 15-16.

86.     At all relevant times, by using the Meta Tracking Pixel, Meta willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and putative Second California Subclass members, while the electronic communications were in transit or passing over any wire, line, or cable, or were being sent from or received at any place within California.

87.     Defendant Sentai aided Meta, agreed with Meta, and conspired with Meta to intercept Plaintiff and Second California Subclass members' communications by implementing the Meta Tracking Pixel to accomplish the wrongful conduct at issue here.

88.     Plaintiff and Second California Subclass members did not consent to any of Defendant's actions in implementing the wiretaps in these groups.  Nor have Plaintiff or Second California Subclass members consented to Meta's intentional access, interception, reading, learning, recording, and collection of Plaintiff and Second California Subclass members' electronic communications between themselves and HIDIVE.

89.     The violation of section 631(a) constitutes an invasion of privacy sufficient to confer Article III standing.

90.     Unless enjoined, Defendant will continue to commit the illegal acts alleged here. Plaintiff continues to be at risk because he frequently uses the search bar function on HIDIVE to find videos on subjects he is curious about.  Plaintiff continues to desire to use HIDIVE for that purpose but cannot without being unwillingly monitored by Defendant and Meta.  Plaintiff may or is likely to use the search bar function on HIDIVE in the future.

91.     Plaintiff and Second California Subclass members seeks all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)     For an order certifying the Class and the First and Second California Subclasses under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class and California Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and the First and Second California Subclasses;

(b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class and the First and Second California Subclasses on all counts asserted herein;

(d)     An award of statutory damages to the extent available;

(e)     For punitive damages, as warranted, in an amount to be determined at trial;

(f)     For prejudgment interest on all amounts awarded;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

### **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated:  August 4, 2023                    **BURSOR & FISHER, P.A.**

By:  ___*/s/ Stefan Bogdanovich*___
            Stefan Bogdanovich

L. Timothy Fisher (State Bar No. 191626)
Neal J. Deckant (State Bar No. 322946)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
            ndeckant@bursor.com
            sbogdanovich@bursor.com

*Attorneys for Plaintiff*